IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


MCCARTER V. PINGILLEY


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


NICOLE MCCARTER, APPELLANT,

V.

PHILLIP A. PINGILLEY IV, APPELLEE.


Filed March 12, 2024.    No. A-23-445.


Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge. Affirmed.

Nicole McCarter, pro se.

Marian G. Heaney, of Legal Aid of Nebraska, for appellee.


MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

### INTRODUCTION

Nicole McCarter appeals from the decree entered by the district court for Douglas County, dissolving her marriage to Phillip A. Pingilley IV. At issue in this appeal is the district court's award of sole custody of the parties' minor children to Pingilley. For the reasons set forth herein, we affirm.

### STATEMENT OF FACTS

*Pleadings.*

McCarter and Pingilley were married in March 2018, and together have four children: Phillip, born in 2013; Lillian, born in 2017; and twins, Rachael and Rebecca, born in 2018.

On September 15, 2021, McCarter, without the assistance of counsel, filed a complaint for dissolution of marriage. The complaint indicated that both she and Pingilley were fit to have

custody of the parties' four children and that a parenting plan had been developed. The complaint requested that the parties be awarded joint legal and physical custody of the children, and stated that McCarter was residing in Buena Vista, Colorado, and Pingilley in Omaha.

On October 4, 2021, Pingilley filed an answer and counterclaim that indicated only Pingilley was fit to have custody of the four children and that a parenting plan had not been developed. The counterclaim requested that Pingilley be awarded sole legal and physical custody of the children. The counterclaim also alleged that such an award was in the children's best interests as McCarter was mentally ill, she had moved out of state and interacted minimally with the children over the last 2 years, and she had assaulted Pingilley.

McCarter, then represented by counsel, filed an amended complaint for dissolution of marriage. The amended complaint again indicated that both parties were fit parents and requested joint legal and physical custody, but also requested that McCarter's parenting time be exercised in significant time blocks given her out-of-state residency. The amended complaint indicated that a parenting plan had not been developed. Pingilley filed another answer and counterclaim again requesting sole legal and physical custody of the children.

*Trial.*

Trial on the matter was held on May 11, 2023, and the following evidence was adduced. McCarter represented herself at trial.

McCarter offered petitions for protection orders into evidence to show a "history of abuse." In McCarter's June 2014 petition and affidavit to obtain a domestic abuse protection order against Pingilley, she alleged a pattern of verbal abuse against herself and the parties' son, Phillip, as well as incidents of Pingilley smacking McCarter in the face and grabbing her by the throat. At trial, McCarter testified that the 2014 petition was "given no cause[.]"In McCarter's June 2017 petition and affidavit to obtain a harassment protection order against Pingilley, she alleged that Pingilley was stalking her, as he would watch her from across the street while she was at work, call her at work on her cell phone roughly 30 times per day, and threaten to harm himself if McCarter ended the relationship. At trial, McCarter testified that the 2017 petition was vacated on her motion.

Pingilley testified that marital difficulties began in January 2019 after McCarter became upset by the method Pingilley used to punish Phillip. Phillip had shoved Lillian to the ground and, in response, Pingilley pushed Phillip onto his bed and the floor multiple times because, "I didn't think it was right he shoved my daughter down like he did, so I wanted him to know what it felt like."

After the disciplinary incident, Pingilley moved into Phillip's room and by his account, McCarter stopped caring for the children for the next 11 months. Pingilley acknowledged that Phillip had been absent from school for a few days during this period as Pingilley was exhausted by caring full-time for the parties' three youngest children, ages 2 and 3 at the time.

Text message conversations between the parties were entered into evidence. In a message to Pingilley on December 4, 2019, McCarter informed him of her request for a work transfer to Texas and her plan to take the children with her. McCarter testified that she wanted to move with the children because Pingilley was not taking the children to school on time and the family's Omaha apartment had recently been shot at. Feeling as though the children were unsafe, McCarter sought to take them to Texas, where she had family in the area. On the evening of December 4,

McCarter returned from work to find Pingilley loading the children into his friends' car. McCarter called the police, who arrived on the scene and prevented Pingilley from taking the children at that time. Pingilley then barricaded himself and the children in Phillip's bedroom by placing a mattress in front of the door.

Pingilley agreed that on the evening of December 4, 2019, he barricaded himself in a bedroom with the children while McCarter attempted to enter the room. In the early hours of December 5, Pingilley messaged McCarter to say that though she had tried to "sneak in here," her attempt to take the children from him had not been successful. Pingilley testified that on December 5, he also observed McCarter packing her car with all of her and the children's belongings.

On December 5, 2019, McCarter filed a petition and affidavit to obtain a domestic abuse protection order against Pingilley on behalf of herself and the four children. In the affidavit, McCarter describes Pingilley barricading himself in a room with the children after learning about McCarter's work transfer request. She also describes Pingilley verbally abusing her and Phillip on multiple occasions. A show cause hearing was set by the district court for December 12. As discussed further below, McCarter was in jail at the time of the show cause hearing and her petition was thus dismissed.

Pingilley testified that on the morning of December 6, 2019, he awoke and noticed that the door to McCarter's bedroom was shut. According to Pingilley, he opened the door to find McCarter in bed with another man. A verbal and physical altercation ensued, which was captured on a video camera inside the parties' apartment. At trial, McCarter denied ever bringing a man into the parties' apartment.

Pingilley later called the police, who viewed the video and arrested McCarter. A copy of the video was received into evidence and shows Pingilley yelling at McCarter who then shoves Pingilley against a wall. A verbal altercation between the parties ensues and McCarter repeatedly smacks Pingilley in the face. Pingilley does not raise his hands toward McCarter, except at the end of the video as he attempts to weave around her to leave the room. Pingilley testified that the children were in the apartment at the time of the altercation but not in the same room where it occurred. McCarter was charged with third degree assault and subsequently convicted of assault and battery of Pingilley. McCarter maintained at trial that Pingilley had been the aggressor.

Pingilley filed for an ex parte domestic abuse protection order against McCarter on behalf of himself and the four children on December 9, 2019. The district court granted the protection order the same day and enjoined McCarter from communicating with Pingilley or the children in any way for 1 year. McCarter failed to appear at the protection order hearing because she was in jail following her arrest for assault. McCarter was also unable to attend the show cause hearing for her own protection order.

The day after Pingilley's protection order expired, December 10, 2020, Pingilley allowed McCarter to see Phillip at a grocery store. On March 3, 2021, Pingilley allowed McCarter to visit all four children in his new apartment on the condition that she not bring her boyfriend. Pingilley had concerns about the boyfriend's substance use, as he had witnessed the boyfriend use methamphetamine. Pingelley also had concerns that the boyfriend was physically abusive toward McCarter. McCarter arrived at the March 3 visit with her boyfriend and Pingilley called the police. McCarter left before the police arrived and the visit never took place.

In May 2021, child protective services performed a welfare check on the parties' daughters at Pingilley's home. Pingilley believed that McCarter had initiated the welfare check. No evidence regarding the outcome of the welfare check was offered at trial. Later that same day, Pingilley received a call from Phillip's school, informing him that McCarter had attempted to leave with Phillip and she had called the police because the school would not release Phillip to McCarter. Pingilley arrived at the school where Phillip was released to him.

McCarter objected to Pingilley's testimony, stating that though she had called "CPS on [Pingilley] . . . multiple times," she had not called them on that occasion. The district court overruled the objection. McCarter also denied that she had demanded Phillip's school release him to her but conceded that she had called the police after the principal would not let her see Phillip.

McCarter testified that because Pingilley refused contact with McCarter and she wanted to work out a visitation arrangement, she went to Pingilley's apartment a few weeks after attempting to see Phillip at his school. Pingilley stated that in June 2021, he was walking toward his apartment building with all four of the parties' children (the three youngest in a double stroller) when he noticed his older estranged son in front of the building with McCarter and her boyfriend. Pingilley called the police. McCarter then attempted to intercept Pingilley with the children and Pingilley attempted to avoid her. At some point McCarter grabbed the stroller. The police arrived on the scene and demanded that McCarter release the stroller and "placed her in handcuffs because she couldn't control her temper." Later the police instructed McCarter to leave the apartment without the children.

McCarter recalled the incident but denied grabbing the stroller or attempting to take the children. McCarter also stated that the police were called by both parties. McCarter attributed the incident as a reason for her leaving Omaha.

McCarter moved to Colorado in June 2021 and since then has had sporadic contact with the children. Pingilley has not allowed the children to go out of state for visits with McCarter. He has allowed for 1 hour of telephone contact between McCarter and all four children per week. Pingilley stated that the arrangement would be different if McCarter lived in Omaha. According to McCarter, she has attempted to send the children items, such as diapers and clothing, but Pingilley has refused to accept the items and told McCarter that he cannot receive packages at his apartment. Pingilley agreed that he told McCarter about his inability to receive packages.

Pingilley filed for temporary custody of the children in February 2022. The district court entered an order awarding Pingilley temporary custody the following month. The order referenced that a hearing on the matter had been held and that McCarter had failed to appear, despite receiving proper notice of the hearing. At trial, McCarter stated that she had not received notice of the hearing.

In November 2022, McCarter wrote to Phillip's teacher and asked her to explore whether Pingilley was touching Phillip inappropriately. At trial McCarter stated that Pingilley had "a history of such with all of his children."

In the spring of 2023, McCarter sent a text message to Pingilley offering him money or marijuana in exchange for a visitation arrangement. McCarter stated at trial that she was desperate to see the children.

Pingilley allowed McCarter unsupervised daily visits with the children in Omaha on April 3-6, 2023, so long as McCarter's boyfriend was not present. A visit occurred on April 3, but as

Pingilley was readying the children on the morning of April 4, one of his daughters told him that the boyfriend had zipped up her coat the day before. Phillip confirmed that the boyfriend had been at the visit when Pingilley inquired. Pingilley canceled the remaining visits between McCarter and the children.

At trial, McCarter stated that she was seeking removal of the children to Colorado as well as an award of sole legal and physical custody. McCarter resides in a three bedroom, two bathroom home with her boyfriend and is presently employed by a hotel earning $20 an hour. McCarter believed that she could add the children to her health insurance for approximately $500 a month. McCarter also referred to making child support payments since 2020, but there was no order for child support in the temporary order, and no further testimony or documentation related to any payments by McCarter were offered into evidence. McCarter testified that she intends to stay in Colorado.

Pingilley lives in a three bedroom, two bathroom apartment with all four children, allowing for Pingilley and Phillip to have their own rooms with the three daughters sharing a room. Pingilley is disabled and is not employed. He receives Social Security benefits in addition to other public benefits, including public housing.

Pingilley testified that all four of the children are happy and well-adjusted. For fun, Pingilley takes the children on walks, to a nearby playground, and to get an occasional treat. Phillip is the only child old enough to be in school, which he enjoys. Pingilley is in touch with Phillip's teachers on a weekly basis.

On cross examination, Pingilley acknowledged that none of the children have been to the doctor or the dentist since December 2019. The parties' daughters, ages 4 and 5 at the time of trial, were still wearing diapers and not toilet trained.

*Decree.*

The district court entered a decree of dissolution on May 31, 2022. The court found that McCarter had moved to Colorado in June 2021, had no intention of returning to Nebraska, and had only sporadic contact with the children since leaving the State. The court noted that McCarter had not pled for removal or offered any evidence that it would be in the children's best interests to move to Colorado. The court further found that it was in the children's best interests to award their sole legal and physical custody to Pingilley, subject to McCarter's visitation as set forth in an attached parenting plan.

On June 5, 2023, the district court entered an order amending the parties' parenting plan.

McCarter appeals.

ASSIGNMENTS OF ERROR

McCarter's brief contains no designated assignments of error section. As such, it does not comply with appellate court rules. See Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2022).

McCarter's brief contains headings in the argument section of her brief which purport to assign error by the district court. The Nebraska Supreme Court has rejected argument headings as insufficient to assign error. See *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023). Where the assignments of error consist of headings or subparts of arguments and are not within a designated assignments of error section, an appellate court may proceed as

though the party failed to file a brief, providing no review at all, or, alternatively, may examine the proceedings for plain error. *Id*. We will review for plain error.

STANDARD OF REVIEW

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id*.

ANALYSIS

*Custody.*

McCarter's first argument heading reads: "Removal/Best Interests of My Children[.]" However, McCarter does not argue any specific error by the district court. Rather, McCarter contends that Pingilley has alienated her from the children and is unfit to care for the children.

Generally, in parental relocation cases, courts must follow the analysis set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). There is a two-step process before a custodial parent is allowed to remove a child from the state of Nebraska. The custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent. See *id*. Removal jurisprudence has been applied most frequently when a custodial parent requests permission to remove a child from the state and custody has already been established. *Hiller v. Hiller*, 23 Neb. App. 768, 876 N.W.2d 685 (2016).

*Olson v. Olson*, 27 Neb. App. 869, 937 N.W.2d 260 (2019) and *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018) both involved instances where prior to the filing of the dissolution complaint, one parent was residing out of state and no prior custody determination had been made. In both cases, our court affirmed the trial court first making a determination of custody, and then conducting a proper *Farnsworth* removal analysis. See *id*.

Here, McCarter had already moved out of state when the instant proceedings began. She did not plead for removal of the children although she testified at trial to that request. The children had been placed in the temporary custody of Pingilley throughout the proceedings. In its final order, the district court properly determined the custody issue first. Because the court determined that it was in the children's best interests to award Pingilley sole legal and physical custody, it was not necessary to conduct a *Farnsworth* analysis. *See*, *Olson v. Olson, supra*; *Kashyap v. Kashyap, supra*.

The best interests of the child require a parenting arrangement and parenting plan which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children. Neb. Rev. Stat. § 43-2923(1) (Reissue 2016). Section 43-2923(6) requires a court, in determining custody and parenting arrangements, to consider certain factors relevant to the best interests of the minor child, including:

> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

See also, *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). In addition to these statutory "best interests" factors, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Id.*

Pingilley has been the children's primary caregiver since January 2019. McCarter has had limited contact with the children since then; first as a result of her assault conviction and protection order, and then as a result of her move to Colorado in June 2021. McCarter offered little evidence to support her contention that it would be in the children's best interests to reside with her in Colorado. McCarter lives with her boyfriend who Pingilley expressed concern about having contact with the children as a result of his alleged drug use and domestic abuse.

It is not our role as an appellate court under a plain error standard of review to substitute our opinion for an opinion of a district court that is reasonably supported by the record. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). Furthermore, we cannot conclude from the record that the factual findings of the district court were so unsubstantiated that any purported errors were injurious to the integrity, reputation, or fairness of the judicial process as to justify reversal on appeal under the plain error doctrine. See *id.* Upon our review of the record, we find no plain error in the district court's conclusion that awarding sole custody of the children to Pingilley was in the children's best interests. Because we affirm placing custody with Pingilley, we need not engage in the removal analysis. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Swicord v. Nebraska Police Stds. Adv. Council*, 314 Neb. 816, 993 N.W.2d 327 (2023).

*Domestic Intimate Partner Abuse.*

McCarter's second argument heading reads: "Domestic Intimate Partner Abuse[.]" Brief for appellant at 22. Again, McCarter does not argue any specific error by the district court. She states that both she and the children have been victims of Pingilley's abuse and alludes to Pingilley having frustrated her ability to see the children.

McCarter cites the statutory definition of domestic intimate partner abuse and the requirement to limit a parent's custody and parenting time if a parent is found by the court to have engaged in domestic intimate partner abuse. See, Neb. Rev. Stat. § 43-2922 (Cum. Supp. 2020); Neb. Rev. Stat. § 43-2932 (Reissue 2016). McCarter also cites to language in a preliminary draft of the Nebraska Parenting Act which provides circumstances where a court shall not consider the absence or relocation of a parent from the family residence as a factor in determining the best

interests of the child. However, this language does not appear in the statutory section comprising the Nebraska Parenting Act. Compare The Nebraska Parenting Act, L.B. 554, 100th Legislature (2007), with Neb. Rev. Stat. §§ 43-2920-943 (Reissue 2016).

To the extent that McCarter argues that the district court's custody award failed to comply with § 43-2932, we find that McCarter did not present sufficient evidence demonstrating that Pingilley had committed domestic intimate partner abuse.

Under § 43-2922(8), "[d]omestic intimate partner abuse" means an act of abuse as defined in Neb. Rev. Stat. § 42-903 (Cum. Supp. 2020) and a pattern or history of abuse evidenced by one or more of the following acts:

Physical or sexual assault, threats of physical assault or sexual assault, stalking, harassment, mental cruelty, emotional abuse, intimidation, isolation, economic abuse, or coercion against any current or past intimate partner, or an abuser using a child to establish or maintain power and control over any current or past intimate partner, and, when they contribute to the coercion or intimidation of an intimate partner, acts of child abuse or neglect or threats of such acts, cruel mistreatment or cruel neglect of an animal as defined in section 28-1008, or threats of such acts, and other acts of abuse, assault, or harassment, or threats of such acts against other family or household members.

The first sentence of § 43-2922(8) directs us to § 42-903(1)(a) to determine if domestic abuse occurred. Section 42-903(1)(a) defines "[a]buse" as "[a]ttempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument" to a family or household member. Spouses and former spouses are considered household members. See § 42-903(3).

Trial evidence demonstrates that the parties had a volatile relationship. Though McCarter offered petitions for protection orders against Pingilley from 2014, 2017, and 2019, none of these petitions were granted by the district court. Rather, after the parties' altercation in December 2019, Pingilley obtained a domestic abuse protection order against McCarter and McCarter was convicted of assaulting Pingilley. No further evidence that McCarter had been abused by Pingilley was adduced at trial.

Thus, we find no plain error in the district court's failure to find that Pingilley had committed domestic intimate partner abuse.

CONCLUSION

We find that the district court did not commit plain error when awarding custody of the minor children to Pingilley. Additionally, the district court did not error in failing to make findings of domestic intimate partner abuse.

AFFIRMED.